Diana Shooting Club v. Lamoreux, 114 Wis. 44.

DIANA SHOOTING CLUB, Appellant, vs. LAMOREUX, Respondent.

*March 11—April 1, 1902.*

*Constitutional law: Title of legislative act: Local act: Private act: Legislative discretion: Corporations: Public lands: Mills and mill dams: Flooding of public domain: Swamp land act of 1850: Waters and watercourses: Navigable lakes: Artificial level of lakes: Statute of limitations: Trespass: Fishing and hunting: Hunting license.*

1. As regards sec. 18, art. IV, Const., the statement of a subject in the title of a legislative enactment is deemed to constitutionally suggest all the details thereof, including everything found in the body of the act which facilitates its object.

2. The constitution does not require the title of a private or local legislative act to go further than to express the subject covered by the body of the law. It leaves the method of expressing such subject to legislative discretion, within all reasonable boundaries.

3. The statement of a primary purpose in general terms in a constitutional sense reasonably includes all the means designed to facilitate the accomplishment thereof.

4. The statement of the primary object of a legislative enactment as being the creation of a corporation for manufacturing purposes, within the meaning of the constitutional provision above mentioned suggests, as germane thereto and as part of the single purpose intended and expressed, authority to acquire and maintain a dam to create power for the use of the corporation, also to acquire lands affected by the backwater from the dam, and authority to the owners of such lands to sell the same to the corporation.

5. Artificial flooding of lands in the public domain of the United States does not affect the title thereto.

6. The federal swamp land act of 1850 vested in the state, as of the date the act took effect, the title to all lands determined by the general land department of the United States to be affected thereby. The decision of such land department on that question is conclusive except against persons claiming under a paramount title.

7. Lands of the United States, at the date of the swamp land act of 1850, approved by the proper officers of the general land department as being lands of the character intended to be

granted thereby, were, by such act and approval, segregated from the public domain and vested in the state, regardless of whether they were, at the date of such act, artificially covered by navigable water, by trespasses upon such domain.

8. The rule that an artificial condition of water may, by lapse of time, become a natural condition as regards public rights, does not apply in the absence of any element necessary to change the title to the land by the operation of the statute of limitations.

9. A wrongful invasion of the right to use land for fishing and hunting is actionable regardless of the amount of the damages caused by such invasion.

10. Every wrongful intrusion by one person upon the legal rights of another is both an injury and a damage and is a proper subject for legal redress.

11. A state license to hunt does not confer any right upon the holder thereof to go upon lands owned by private parties without their permission.

[Syllabus by MARSHALL, J.]

APPEAL from a judgment of the circuit court for Dodge county: JAMES J. DICK, Circuit Judge. *Reversed.*

Action to recover damages for trespassing upon an alleged exclusive right to hunt on certain lands. The title to the lands was put in issue by the pleadings. Plaintiff's right to recover turned on whether it possessed the right claimed. Defendant insisted that the lands were formerly the bed of a lake, and that the state had never parted with its title thereto.

The following facts were disclosed by the evidence, and are covered, in the main, by the findings of the court: Plaintiff is a corporation organized for the purpose of hunting. It has existed since prior to September 2, 1900. On that day defendant, who possessed a hunter's license from the state, went upon the lands in dispute for the purpose of enjoying the same. While he was so doing he tramped down some grass and did the acts complained of. The land entered upon by defendant is a part of what is known as "Horicon Marsh." It was once a part of the bed of what was known as "Horicon Lake." The lake, so called, covered about 19,000 acres of

land.   The United States survey, made in 1837, included
Horicon Marsh as a part of the public domain.   The lake
was created by the flooding of the marsh by means of a dam
constructed across Rock river in 1846.   The lake existed con-
tinuously thereafter until 1868.   The dam was then destroyed
and the lands were thereby uncovered and restored substan-
tially to their original condition.   All of the marsh lands were
conveyed to the state of Wisconsin under the United States
swamp land act of 1850.     By ch. 454, P. & L. Laws of
1867, an attempt was made to create a corporation known as
the "Mechanics' Union Manufacturing Company," and to
empower it to maintain the dam aforesaid and acquire from
the state its title to said overflowed lands.   The title of the act
is as follows: "An act to incorporate the Mechanics' Union
Manufacturing Company."   In and by said act commissioners
were provided for, to appraise the property right of the state
in said overflowed lands; they were withdrawn from the
general market, and the corporation was given the exclusive
right to acquire the same at the appraised value thereof at
any time within two years from the time of the passage of
the act.   The lands were appraised as directed by said act and
in due time and form of law were, at their appraised value,
conveyed to said corporation.   During all the time of the
existence of the artificial lake, which covered a period of more
than twenty years, it was a navigable body of water.   At the
time of the alleged wrong, plaintiff possessed all the right to
go upon the premises in question to hunt which the state con-
veyed to the Mechanics' Union Manufacturing Company in
the attempted conveyance of the fee title to said lands.
Plaintiff's right was in the form of a grant in writing for a
consideration for a fixed term of years to use the premises,
subject to the reserved right of cutting grass and pasturing
stock.

From such facts the court decided that the act of 1867 was
unconstitutional and void; that the state never acquired any

proprietary right in the lands covered by the waters of Hori--
con lake; that when the state was admitted into the Union
said lands were lake bed the same as land forming the bed
of a natural lake, and that the title thereto passed to the state
at that time in trust, in all respects the same as any lands
under its navigable waters; that the state never possessed any
proprietary right in said lands, hence that. it was powerless
to make any conveyance thereof to the Mechanics' Union
Manufacturing Company; that plaintiff, at the time of the
alleged trespass did not have any exclusive right to the pos-
session of the premises in dispute or any better right to such
possession than any private person; that the lands have
never ceased to have the character of the submerged lands of
a natural lake; and that defendant, at the time of the alleged
trespass, had a right to enter thereon for the purpose of hunt-
ing.   Judgment was accordingly entered dismissing the com-
plaint with costs.

For the appellant there were briefs by *J. E. Malone* and
*Joseph B. Doe,* and oral argument by *Mr. Doe.*

For the respondent there was a brief by *Lamoreux & Hust-*
*ing,* and oral argument by *E. Merton.*

MARSHALL, J.   The first question which naturally engages
our attention in considering the assignments of error upon
this appeal is, Did the court err in holding that ch. 454, P. &
L. Laws of 1867, is unconstitutional?   Appellant depends
entirely upon the validity of that act to make out a paper
title to that which respondent is charged with having violated.
The trial court decided that the act is invalid because it vio-
lates sec. 18, art. IV, of the constitution, which provides:

"No private or local bill which may be passed by the legis-
lature shall embrace more than one subject, and that shall be
expressed in the title."

To sustain that decision, much reliance is placed on *Durkee*
*v. Janesville,* 26 Wis. 697, where it was held that a local act

violates the constitutional limitation mentioned unless its title refers to the locality to which the act applies.   The infirmity in that position is in the fact that the act in question is not a local, but is a private act.   There have been so many decisions on the subject of the scope of the constitutional provision in question, that no new light can be easily, if at all, shed thereon.   Some rules have been deduced from the various decisions, which furnish pretty safe guides to go by, and to those we will refer.

It has been repeatedly held that the title of an act should be liberally construed; that it should not be condemned as insufficient to constitutionally suggest those things found in the body of the act unless, giving thereto the largest scope which reason will permit, something is found therein which is neither within its literal meaning nor its spirit, nor germane thereto.   Courts cannot sit in judgment upon the work of the legislature and decide one of its acts unconstitutional, merely because the title thereof is not as comprehensive as it might have been made.   Within all reasonable boundaries, legislative discretion in that field cannot be rightfully interfered with.   This court has said:

"Titles of acts should be liberally construed, and acts will be upheld if they substantially comply with this section, though their titles do not express their subjects as fully and unequivocally as possible." *Mills v. Charleton,* 29 Wis. 400.

Any number of provisions, all relating to a single object, including all the necessary or reasonable details thereof, may be covered by a title in such general terms as to fairly indicate such subject, the unity of the subject being taken as including within its scope all the details provided to effect the single legislative purpose.   *Milwaukee Co. v. Isenring,* 109 Wis. 9, 22, 85 N. W. 131.   The court of appeals of New York, speaking on the same subject, held that neither that court nor any other has said anything justifying the position that the various methods adopted in a bill to carry out its general de-

sign must be enacted by several bills in order to comply with the constitutional limitation; that courts cannot legislate, nor dictate legislation, nor have any concern with questions of mere propriety or wisdom. *Matter of Mayer,* 50 N. Y. 504, 508. Every subject which the court can see would or might facilitate the accomplishment of the primary purpose named in the title of an act is germane thereto, and may be considered as constitutionally suggested by the expression of such primary purpose. *People ex rel. Rochester v. Briggs,* 50 N. Y. 553, 564. 'The constitution does not require the title of a private or local bill to disclose or shadow forth the character of the proposed legislation, its full scope and purpose, and to make known the several interests which may be directly or indirectly affected by it so as to attract attention and give notice of all that is to be accomplished by the proposed act.' 'The constitution requires the subject of the act to be expressed in the title, but leaves the mode of expressing it wholly to the discretion of the legislature.'· *People ex rel. Comm'rs v. Banks,* 67 N. Y. 568, 572. The supreme court of South Carolina is in line with the foregoing. It said, in *Connor v. G. P., W. & B. R. Co.* 23 S. C. 427, 435:

"When a question under this clause of the constitution is presented for adjudication, we are bound to take a liberal and enlarged view, and if practicable bring the legislation which is assailed as unconstitutional within the limits prescribed by the supreme law of the land."

'Everything which facilitates the subject or object of an act is covered by the expression of the subject.' The supreme court of the United States, in harmony with the decisions cited, holds that 'all the provisions of an act which are appropriate to carry out the expressed object thereof are sufficiently indicated by the expression of such object, and are in a constitutional sense included therein.' *Mahomet v. Quackenbush,* 117 U. S. 508, 511.

The foregoing sufficiently shows the extent to which courts have gone in resolving all reasonable doubts in favor of legislative power to the end that it may be in fact what the framers of the constitution intended it should be, independent and unimpeachable, within the broadest limits which reason can ascribe to constitutional limitations, having regard to the letter as well as the spirit thereof, the persons concerned in legislating being left, within such limitations, responsible for their conduct solely to the people. It is not improbable that the constitutional purpose in respect to the subject under discussion has in a measure failed because of the conservatism of that branch of our governmental system which is clothed with the duty of defining the limits set by the constitution for legislative power. If so, in that we have a demonstration that the rights of the people stand in no danger of judicial encroachments upon legislative and executive power. If the people desire to have the hands of such branches of the government tied more closely than the courts have been able to discover has been accomplished by the constitution as framed, the way is open to do so by further and more definite constitutional limitations. The court performs its full duty when it resolves all reasonable doubts against constitutional limitations upon legislative power, and unhesitatingly and vigorously enforces the restraints which are found to have been embodied by the people in their organic act of government. In that the court maintains such limitation in letter and spirit so far as judicial rules will permit, and it must be assumed that such rules were well understood when the constitution was framed and courts were created, charged with the office of construing it.

Probably as comprehensive a rule as can be found stated in the books, for testing the sufficiency of a title to a private or local legislative act, is the one deduced from the authorities by the New York court of appeals and approved in *Milwaukee Co. v. Isenring,* 109 Wis. 9: When one, reading a bill

with the full scope of the title thereof in mind, comes upon provisions which he could not reasonably have anticipated because of their being in no way suggested by the title in any reasonable view of it, they are not constitutionally covered thereby. But in applying that rule, this other rule, which has been universally adopted, must be kept in mind: The statement of a subject includes, by reasonable inference, all those things which will or may facilitate the accomplishment thereof. *People ex rel. Brockport v. Sutphin,* 166 N. Y. 163, 59, N. E. 770; *Hope v. Gainesville,* 72 Ga. 246. The extent to which the courts have gone in applying those principles is indicated by the following. An act entitled "An act to incorporate a railway company," specifying the name thereof, has been repeatedly held to include all provisions which may be reasonably considered to have been designed to aid in forming the corporation and accomplishing the object thereof, including a grant of power to a municipal corporation to take stock in the company, to issue municipal bonds in payment thereof, and all necessary provisions in regard to the details of taxation to raise money to pay the principal and interest on such bonds. *Hope v. Gainesville, supra; Mahomet v. Quackenbush,* 117 U. S. 508; *Schuyler Co. v. People ex rel. R. I. & A. R. Co.* 25 Ill. 181, 183. An act entitled "An act to incorporate the Firemen's Benevolent Association and for other purposes," was held to constitutionally suggest a provision requiring the agents of all foreign insurance companies doing business at the home of the corporation to pay two per cent. of all premiums received by them to the association treasury for its use. *Firemen's B. Asso. v. Lounsbury,* 21 Ill. 511. An act entitled "An act to amend the charter of Covington & Cincinnati Bridge Company," was held to suggest the subject of corporate power on the part of the bridge company to sell a part of its corporate stock to the city of Covington, and the subject of municipal power on the part of such city to take the stock, issue its corporate bonds in pay-

ment thereof, and levy and collect taxes from time to time to meet the principal of and interest on such bonds. *Phillips v. Covington & C. B. Co.* 2 Met. (Ky.), 219. An act entitled "An act to incorporate the Northwestern University" was held to include, as germane to the primary subject so expressed, a prohibition of the sale of spirituous liquors within four miles of the location of the college. *O'Leary v. Cook Co.* 28 Ill. 534. An act entitled "An act for the more uniform mode of doing township business," was said to include the subject of organizing new towns. *Clinton v. Draper,* 14 Ind. 295. An act entitled "An act to regulate proceedings in the county court" was said to suggest provisions regarding proceedings in the appellate court in the hearing and disposition of cases appealed from the county court. *Murphey v. Menard,* 11 Tex. 673.

Many more illustrations might be added to those we have given. Some mentioned seem to be rather extreme applications of the very liberal rule that everything found in the body of a legislative act should be deemed included in the title expressing a single subject, which may be reasonably considered as liable to facilitate the primary object of the enactment so expressed. It is not necessary for the purpose of this case to go so far as many of the courts have gone. We should hesitate long before doing so, as it would leave the constitutional limitation under consideration without valuable force. The spirit of the constitutional restraint can be made effective and still leave the legislature sufficiently free in the exercise of its discretionary power that it will not be embarrassed in any legitimate effort to perform its duties. It is reasonable to hold that the statement of a subject, by reasonable inference, states the details thereof, and that such details may be as broad as the purpose suggested by the subject in any reasonable view thereof, and are in a constitutional sense suggested thereby, so that no one need reasonably be astonished at coming upon any one of them in reading an act in

which they are included, the reader having in mind the full scope of the primary object of the enactment as expressed in its title. That rule carries out the constitutional requirement that the subject of an act shall be single and be stated in the title, leaving the legislature to exercise a broad discretionary power as to the mode of expressing it.

The subject of the act before us is the incorporation of a manufacturing company. That subject suggests at once a manufacturing business as the object of creating the corporation. It also implies, necessarily, a requirement for motive power and means of creating it, as by water, and, as necessary thereto, the maintenance of a dam; and to that end the right to acquire and maintain a dam. That suggests the necessity of acquiring the title to lands affected by the backwater of the dam, and power of the owner of such lands to sell the same to the corporation and to preserve existing conditions necessary to the exercise of such power. All of those matters are included in the act in question. The learned trial court supposed that the power granted to the corporation to maintain a dam, and to acquire, from the state, title to the lands covered by the backwater of the dam, and authority to the state to sell the land to the corporation and to retain the title thereto till that power could be exercised, were, in whole or in part, not germane to the mere creation of the corporation, hence that the act covered more than one subject and violated the constitution. Hence the act was condemned as invalid. Enough has been said to clearly show, in the light of the settled construction of the constitutional provision in question, that such decision cannot be sustained.

What has been said entirely relieves appellant's case from the supposed infirmity of there being no valid law creating the state's grantee of the lands in question and giving the state authority to convey the lands to such grantee, if, under any circumstances, it could so deal therewith. Ch. 454, P. & L. Laws of 1867, creating the Mechanics' Union Manufactur-

ing Company is a constitutional enactment. It gave to the appropriate executive and administrative officers of the state authority to convey to such corporation whatever proprietary title the state had to the lands referred to therein. We do not deem it necessary to consider the history of the passage of the act through the legislature. The wisdom of the measure and those things in respect thereto indicating that the legislature did not properly guard the interests of the state, which, by the industry of counsel, were brought to the attention of the trial court, do not concern the merits of the case, since they involve no constitutional question.

The next question to be considerd is, What was the nature of the state's title to the lands covered by the waters of Horicon lake, so called, at the time of the attempted conveyance thereof pursuant to the act of 1867 ? The learned trial court supposed it was the same as that to any land covered by the waters of a natural navigable lake, and that the numerous decisions of this court to the effect that the state has no proprietary right in such lands, no right which it can sell as state property, rule the case. True, the navigable waters of the state and the lands upon which they rest, as the same existed when the state was admitted into the Union, speaking only of natural bodies of water, became, at the instant of such admission, vested in the state for those public purposes incident to navigable waters at common law, and the state is powerless to change its relation thereto so far as the preservation of such relation is necessary to the trust, and it has not been changed at all as regards the beds of navigable lakes. *Ne-pee-nauk Club v. Wilson,* 96 Wis. 290, 71 N. W. 661; *Priewe v. Wis. State L. & I. Co.* 93 Wis. 534, 67 N. W. 918; *Willow River Club v. Wade,* 100 Wis. 86, 103, 76 N. W. 273; *Illinois S. Co. v. Bilot,* 109 Wis. 418, 426, 84 N. W. 855, 85 N. W. 402. True, also, if an artificial lake is created, or artificial level of a natural lake is caused by the erection of a dam, and such condition is allowed to exist ad-

versely for the full statutory period necessary to change the ownership of the land affected thereby, the former owner thereof cannot thereafter object to a continuance of such condition. By operation of the statute of limitations the artificial condition is thus stamped with the character of a natural condition, and the title to the-lands covered by the waters of the lake is deemed to have passed from private ownership to the same trust as that of lands covered by the waters of natural navigable lakes. The state, and private owners, as well, of lands affected by the artificial condition, may enforce the maintenance of that condition. No one can enforce its discontinuance. *Smith v. Youmans,* 96 Wis. 103, 70 N. W. 1115; *Mendota Club v. Anderson,* 101 Wis. 479, 78 N. W. 185; *Pewaukee v. Savoy,* 103 Wis. 271, 276, 79 N. W. 436. But we are unable to see how those principles can be applied to the facts of this case. Counsel suggest, as the turning point in that regard, the following:

"Were the premises in question submerged lands in the year 1867, at the date of the alleged patent to the Mechanics' Union Manufacturing Company, and had they been such submerged lands for upwards of twenty years within the meaning of the decisions of this court, so that the title to the same became vested in the state in trust?"

In presenting that proposition for consideration counsel seem to assume that if the lands, for a period of twenty years prior to the making of the patent in 1867, were artificially submerged, the waters covering the same being navigable during such period, it must be answered in their favor, entirely overlooking the fact that the submerged condition must have existed under such circumstances as to change the title thereto from a proprietary to a mere trust character by the operation of the statute of limitations before it was interrupted, else no lake was created by prescription; that the mere fact of the existence of the artificial lake for twenty years does not solve the controversy. It stands admitted that the terri-

tory in question was covered by the United States land sur-
veys long prior to the creation of the lake by the building of
the dam across Rock river. The government plats (which we
may properly refer to even though not in evidence) show
such to be the fact. While the dam was built and the lands
were covered by water in 1846, the title remained in the
United States till the passage of the swamp land act of 1850,
and was of course not affected by any statute of limitations.
The statute began to operate against the state at the earliest
date it acquired its title. Twenty years did not elapse there-
after till the patent was made conveying such title under the
act of 1867 and the restoration of the lands to their former
condition was accomplished by the destruction of the dam.
The conclusion is irresistible, under those circumstances, that
the lake created by the dam did not, prior to its discontinu-
ance, become a natural lake by prescription. In 1850 the
land was part of the surveyed public domain of the United
States, unaffected by the artificial condition created by the
dam previously built. If the lands were swamp lands, the
title thereto, by the swamp land act, passed to the state as
state property. While the decision of the land department
of the general government as to whether lands were or were
not covered by navigable waters at any particular time does
not foreclose that question, as to whether lands were uplands
or swamp lands within the meaning of the swamp land act at
the time it took effect, the decision of such department is con-
clusive in all courts and as to all parties except a claimant
by paramount title. *Quinby v. Conlan,* 104 U. S. 420. The
United States land department regularly approved the lands
in question as swamp lands within the meaning of the act of
1850, and the title of the state thereby became perfect as of
the date such act took effect. That title was just as perfect
when the patent was made under the state act of 1867, to the
corporation under which plaintiff claims, as it was on the day
it became vested in the state. The statute of limitations had

not then run against the state. It was interrupted before the title to the land became affected thereby. Therefore, the corporation, grantee of the state, obtained a perfect title to the lands described in its patent.

Counsel for respondent call attention to the ruling of the land department that the conditions existing when the swamp land act took effect must be looked to to determine whether the title to the land in question passed to the state thereunder, and contend, as we understand them, that the same rule should govern in determining whether the state, when it was admitted into the Union, took the title to the land as territory under navigable waters. It is sufficient to say on that subject that the rule to which counsel refer, citing an opinion by the commissioner of the general land office (*In re State of California,* 14 Land Dec. Dep. Int. 255), applies only to natural bodies of water, not to artificial lakes created by trespassing upon the public domain. The lands in question, as stated, were part of the public domain of the United States when they were surveyed by its authority. The artificial condition thereafter adversely created was properly treated by the general land department as ineffectual to change that condition, turning the land into the subject of a trust for a state to be formed. After the passage of the swamp land act it devolved upon the general land department to decide what part of the public domain was affected thereby, transferring the title thereto to the states. The territory in question was in due form approved as being so affected, and respondent is in no position to impeach that decision.

What has been said removes all the substantial support for the judgment appealed from, upon which the trial court rested it. There is a finding that appellant was never in the exclusive possession of the land. Inasmuch as its right does not rest on evidence of mere possession, but is based on a good

paper title to the exclusive use of the land for all purposes except cutting grass and pasturing stock, a violation thereof by respondent was unquestionably actionable. *Stephenson v. Wilson,* 37 Wis. 482.

Respondent's counsel insist that appellant, at best, was a mere licensee, hence could not maintain this action. In the first place appellant's right was not that of a mere licensee. It possessed a grant for a term of years, created by a written conveyance, of the exclusive right to the premises for some purposes, as before indicated.   That created the relation of landlord and tenant between appellant and the holder of the legal title.   1 Wood, Landlord & T. (2d ed.), § 223.   In the second place, it makes no difference what the exact nature of appellant's interest in the premises was, since the evidence is conclusive that it was wrongfully violated by respondent. From such violation a cause of action accrued to appellant to recover such damages as were proximately caused thereby. In contemplation of law, every violation by one person of a legal right of another, impairing to any extent, however slight, the enjoyment of that right, is an actionable wrong. Sutherland, Dam. § 9. The constitution guarantees a remedy in all such cases. Sec. 9, art. I. The amount of the damages suffered or recoverable, whether substantial or merely nominal, is no test of the right to a judicial remedy to redress a wrong.   Counsel for respondent seem to think that no recovery can be had in this case unless appellant makes out a case satisfying all the essentials of a common-law action of *quare clausum fregit.*   While it seems that such essentials were satisfied by the evidence in this case, that was not necessary.   It was sufficient to show that respondent committed a hostile intrusion upon appellant's legal right to the premises in question. *Williams v. Esling,* 4 Pa. St. 486. It was very early held that a mere wrongful intrusion by one person upon a legal right of another, regardless of the amount of the

resulting damages, in contemplation of law is both an injury
and a damage and is a subject for legal redress.   *Weller v.
Baker,* 2 Wils. 422; *Hobson v. Todd,* 4 Term, 71.

It is suggested that the court ought to hold that a person
may go upon the land of another to hunt or fish without per-
mission of the latter, and without incurring any legal lia-
bility for so doing, so long as such person does not cause any
substantial damage to such other's property rights.   What
principle of law such a doctrine could be grounded upon we
are unable even to suspect.   Every person has a constitu-
tional right to the exclusive enjoyment of his own property
for any purpose which does not invade the rights of another
person.   The mere fact that fish and game, in their natural
condition, belong to the state for the enjoyment of the whole
people, and that the state may regulate the manner of such
enjoyment by compelling those who desire to participate
therein to take out licenses, does not militate in the slightest
degree against the property rights of others.   No person has
a right to go upon the land of another against the latter's
will, or to so intrude upon the right of such other to the ex-
clusive use of lands for any purpose, merely because he pos-
sesses a state license to hunt.   Such a license does not affect
the relations of the licensee with such other in the slightest
degree.   A violation of the latter's rights by such person,
which would be an actionable wrong if he were not armed
with a state license to hunt, would be such a wrong if he were
so armed.   It is a mistaken notion that such a license gives
the holder thereof any right whatever to trespass upon the
property of others.

The evidence in this case does not show that appellant suf-
fered any substantial damage by the wrongful conduct of re-
spondent.   Appellant did not own the grass that was tramped
down.   The damage caused by the wrongful conduct was
merely nominal.   Appellant should have been allowed upon

the evidence to take judgment for nominal damages and costs.

*By the Court.*—The judgment of the circuit court is reversed, and the cause remanded with directions to render judgment in favor of the plaintiff in accordance with this opinion.